IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LAURA J. HATCHER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 13-CV-407-NJR-SCW |
| | ) |
| BOARD OF TRUSTEES OF SOUTHERN ILLINOIS UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Pending before the Court is a motion for summary judgment filed by Defendant Board of Trustees of Southern Illinois University ("the Board") on September 9, 2014 (Doc. 81). The Board contends that it is entitled to judgment as a matter of law on Plaintiff Laura Hatcher's claim of gender discrimination, which is the only claim remaining in this case. Dr. Hatcher filed a brief in opposition to the motion for summary judgment (Doc. 86), and the Board filed a reply brief (Doc. 89). After the motion was fully briefed by the parties, the Court heard oral arguments at a hearing on January 20, 2014, and the motion was taken under advisement. For the reasons set forth below and those stated on the record, the motion for summary judgment is granted.

### FACTUAL BACKGROUND

Southern Illinois University at Carbondale ("the University") hired Laura Hatcher in July 2006 as a non-tenured Assistant Professor in the Political Science Department in the College of Liberal Arts (the "COLA"). In the fall of 2011, Dr. Hatcher

was considered for promotion to Associate Professor with tenure. If she was denied tenure, her employment with the University would end.

The tenure review process at the University is a multi-level, sequential process. The tenure candidate is first evaluated by the tenured faculty and the chairperson of the respective department, followed by the COLA Promotion and Tenure Committee ("the COLA Committee"), the Dean of the COLA, and the Provost and Vice Chancellor of the University. At each level, the previous recommendations are reviewed and an independent evaluation is conducted. Candidates are evaluated in three categories: scholarship, teaching, and service. Only the scholarship category is at issue here. In this category, the quantity and quality of the candidate's publications, professional activities, and funded research activities are assessed (Doc. 82-4, p. 3).

The tenured faculty in the Political Science Department voted 4-2 in favor of tenure and promotion for Dr. Hatcher. Her department chair, Roger Clinton, strongly recommended tenure and promotion. He submitted a written summary of the Department's vote and his recommendation to the COLA Committee. Neither party submitted this report to the Court as evidence.

The COLA Committee's vote on Dr. Hatcher was split: 5-4 in favor of tenure and 4-5 against promotion. Darren Sherkat, the Chair of the COLA Committee, submitted a written summary of the Committee's recommendation to Dean Kimberly Kempf-Leonard (Doc. 82-11). He indicated that the Committee had concluded that Dr. Hatcher had demonstrated excellence in teaching and service, but not in research (Doc.

82-11). In particular, she lacked publications in high-profile venues and mainstream political science venues (*Id.*).

Dean Kempf-Leonard then recommended denying both tenure and promotion to Dr. Hatcher (Doc. 86-1). She agreed with the COLA Committee that Dr. Hatcher had demonstrated excellence in teaching and service, but not in research (*Id.*). She explained that Dr. Hatcher "has produced high quality, important work, but of insufficient volume and in venues that are unlikely to bring her work much visibility beyond a small group of professionals who work in her same narrow area. I believe she spent too much time presenting her work, and too little time seeing it to successful publication in peer-reviewed outlets." (*Id.*).

Provost and Vice Chancellor John Nicklow then denied tenure and promotion for Dr. Hatcher in a letter dated March 1, 2012 (Doc. 82-13). Provost Nicklow explained that although Dr. Hatcher had "established a satisfactory record of performance with respect to teaching and service, [she had] not demonstrated the same level of performance with respect to research and creative activity in [her] field." (*Id.*). He further explained that "the lack of peer-reviewed publications is troublesome and is not consistent with the level of work expected for promotion and tenure" and that the "mixed reviews" from external reviewers "confirm my assessment that your limited scholarly activity and circumscribed impact are below that expected at this stage in your probationary period." (*Id.*).

While Dr. Hatcher was denied tenure and promotion, two of her male colleagues from the Department of Political Science were promoted to Associate Professor with

tenure: Roudy Hildredth and Stephen Bloom (Doc. 82-14). Both Hildredth and Bloom received positive recommendations at each level of the tenure review process (*see* Docs. 82-14 through 82-18).

After Dr. Hatcher received the letter from the Provost denying her tenure and promotion, she filed a grievance with the University's Judicial Review Board ("the JRB"). On October 18, 2012, the JRB issued its Recommendation, sustaining in part and rejecting in part, Dr. Hatcher's grievance (Doc. 82-19). The JRB sided with Dr. Hatcher and concluded that Provost Nicklow violated the procedures outlined in the operating papers of the Political Science Department and the COLA as well as the University's policies and procedures (Doc. 82-19). In particular, Provost Nicklow did not explain in detail how he reached his decision and why he reversed the Political Science Department's recommendation on Dr. Hatcher (Doc. 82-19). The JRB found "serious procedural errors" and recommended overturning the negative decision of Provost Nicklow and promoting Dr. Hatcher to Associate Professor with tenure (Doc. 82-19).

Chancellor Rita Cheng then reviewed the JRB's recommendation, which she accepted in part and rejected in part (*see* Doc. 82-21). She agreed that Provost Nicklow's letter denying Dr. Hatcher tenure did not contain adequate detail, however, she found that there was no evidence that the lack of detail changed the outcome of Dr. Hatcher's promotion and tenure decision (*Id.*). As such, Chancellor Cheng concluded that the remedy of granting tenure was too drastic for a procedural violation, and instead, she directed the Provost to rewrite his letter to Dr. Hatcher and provide a detailed analysis regarding his decision to deny her tenure and promotion (*Id.*). Provost Nicklow issued a

revised letter on December 12, 2012 (Doc. 82-22). Dr. Hatcher's employment with the University ended on May 15, 2013 (Doc. 82-23).

Dr. Hatcher filed a discrimination charge with the EEOC on October 3, 2012, and she received her right-to-sue letter on March 12, 2013 (Doc. 1-1). She filed the instant lawsuit on April 26, 2013.

## DISCUSSION

In short, Dr. Hatcher argues that she was discriminated against on the basis of her gender because she was denied tenure and promotion even though her record of research and publication were equivalent to Professors Hildredth and Bloom, who were awarded tenure and promotion. The Board argues that it is entitled to summary judgment on Count 1 for two reasons: (1) Dr. Hatcher failed to file a timely charge with the EEOC and therefore she was precluded from bringing suit, and (2) there is no evidence, direct or circumstantial, that Dr. Hatcher's gender played any role in the tenure decision.

**A. Legal Standard for Summary Judgment**

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether a genuine issue of material fact exists, [the Court] must view the record in a light most favorable to the nonmoving party. Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial.… A mere

> scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion.

*Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001) (citations and quotations omitted). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

### B. Failure to File a Timely EEOC Charge

The Board first argues that it is entitled to summary judgment because Dr. Hatcher failed to file a timely charge with the EEOC and therefore she was precluded from bringing suit. However, the Board has waived this argument for more than one reason. First, the argument was mentioned as a mere aside and relegated to a footnote in the Board's memorandum (*see* Doc. 82, p. 15 n.11). *See Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) ("We have often said that a party can waive an argument by presenting it only in an undeveloped footnote"); *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 924 (7th Cir. 2012) (finding waiver when argument was in footnote, consisted of four sentences, and did not contain any citation to authority); *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009) (finding waiver when argument was a one-sentence assertion in a footnote with no citation to the record); *United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989) (argument raised in passing in a footnote deemed waived).

Second, the Board did not plead this argument as an affirmative defense (*see* Doc.

79). Failure to timely file an administrative charge is an affirmative defense. *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009). Accordingly, it must be raised in the pleadings, or it may be deemed waived. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (filing a timely charge with the EEOC is . . . a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling); *Ameritech Ben. Plan Comm. v. Commc'n Workers of Am.*, 220 F.3d 814, 819 (7th Cir. 2000) (same).

Even if the Board had not waived the argument, it is meritless. The anti-discrimination provision of Title VII forbids an employer from "so-called discrete acts of discrimination" with respect to an employee's compensation, terms, conditions, or privileges of employment based on the employee's gender. 42 U.S.C. § 2000e-2(a)(1); *Turner v. Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010). Before filing a Title VII suit based on a discrete act of discrimination, an employee must first file a timely EEOC charge. *Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 836 (7th Cir. 2008) (citing *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 623–24 (2007)). "Such a charge must be filed within 300 days after the alleged unlawful employment practice occurred or else the employee may not challenge the practice in court." *Chaudhry*, 546 F.3d at 836 (citing *Ledbetter*, 550 U.S. at 623–24)).

With regard to tenure decisions, the 300-day limitations period starts to run on the day that the tenure decision is made and communicated to the faculty member. *Delaware State College v. Ricks*, 449 U.S. 250, 258, 259 (1980). The Board contends that the limitations period began to run on the day that Hatcher was notified of Dean Kempf-Leonard's negative tenure recommendation (Doc. 82, p. 15 n.11). But the Dean

did not make the tenure decision. She merely made a recommendation. And her recommendation had to be approved by the Provost before the decision was final (*see* Doc. 82-13). Therefore, the clock started running on the date that Provost Nicklow made his decision and communicated it to Dr. Hatcher: March 1, 2012 (Doc. 82-13). Dr. Hatcher filed her EEOC charge on October 3, 2012, which was roughly 217 days after she was notified of the negative tenure decision. Accordingly, her EEOC charge was timely.

C. **Gender Discrimination**

The Board next argues that it is entitled to summary judgment because there is no evidence, direct or circumstantial, that Dr. Hatcher's gender played any role in the tenure decision. The Court agrees.

Title VII prohibits employers from discriminating based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). In order to succeed in a Title VII lawsuit for gender discrimination, a plaintiff must show that her employer took an adverse employment action against her because she is a woman. *See Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). When the adverse employment action is the denial of tenure at the college or university level, "practical considerations make [the] challenge an uphill battle." *Blasdel v. Nw. Univ.*, 687 F.3d 813, 815 (7th Cir. 2012). The Court "must not ignore the interest of colleges and universities in institutional autonomy," or "[a] university's prerogative to determine for itself on academic grounds who may teach, [which] is an important part of our long tradition of academic freedom" *Id.* at 816.

A Title VII plaintiff can prove her case through either direct or indirect proof of discrimination. *Morgan*, 724 F.3d at 995. A plaintiff proceeding according to the direct

method is entitled to present any evidence she can muster, direct or circumstantial, that would permit a jury to infer that discrimination motivated an adverse employment action. *Morgan*, 724 F.3d at 995; *Hester v. Indiana State Dep't of Health*, 726 F.3d 942, 947 (7th Cir. 2013); *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011); *Sun v. Bd. of Trustees of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007). "Direct evidence is something close to an explicit admission by the employer that a particular decision was motivated by discrimination; this type of evidence is rare, but it 'uniquely reveals' the employer's intent to discriminate." *Diaz*, 653 F.3d at 587. Circumstantial evidence, on the other hand, reveals an employer's intent to discriminate by "assembling a number of pieces of evidence none meaningful in itself," but when taken as a whole, are strong enough to allow the trier of fact to draw the necessary inference. *Morgan*, 724 F.3d at 995; *Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). "A number of weak proofs can add up to strong proof." *Sylvester*, 453 F.3d at 903 (citing *Mataya v. Kingston*, 371 F.3d 353, 358 (7th Cir. 2004)).

On the other hand, the indirect method uses a burden-shifting approach under which the plaintiff must first establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for tenure; (3) she was denied tenure; and (4) a similarly situated applicant not in the protected class was granted tenure. *Sun*, 473 F.3d at 814 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. *Sun*, 473 F.3d at 814. If the employer does so, the burden shifts back to the

plaintiff to produce evidence showing that the stated reason is merely pretext and the real explanation for the action is discrimination. *Id.*

Regardless of whether the plaintiff is litigating her case under the "direct" or an "indirect" method of proof, her task in opposing summary judgment is the same: she must produce enough evidence, whether direct or circumstantial, to permit the trier of fact to find that her employer took an adverse action against her because she is a woman. *See Morgan*, 724 F.3d at 995, 997.

It appears to the Court that Dr. Hatcher believes she can prevail under both the direct and indirect methods of proof. With respect to the direct method, the Board argues that Dr. Hatcher cannot proceed under this method because there is no direct evidence of discrimination (Doc. 82, p. 14). Specifically, there is no evidence of gender-based remarks by any decision-makers (Doc. 82, p. 14, n.10). With respect to the indirect method, the Board does not dispute the first and third prongs of the prima facie case—Dr. Hatcher is a woman, and she was subject to an adverse employment action (namely the denied of tenure and promotion). Rather, the Board argues that Dr. Hatcher cannot establish the second and fourth prongs because she was not qualified for tenure, and she was not similarly situated to any male who was granted tenure (Doc. 82, pp. 14–18). The Board also argues that Dr. Hatcher cannot establish evidence that the reason the University gave for denying her tenure was pretext (Doc. 82, pp. 18–19).

The Board is correct that there is no direct evidence or explicit admission of discrimination. However, the lack of direct evidence does not defeat use of the direct method. *See Sylvester*, 453 F.3d at 902. The Board ignores that Dr. Hatcher can proceed

under the direct method with circumstantial evidence. The Seventh Circuit has recognized three types of circumstantial evidence of intentional discrimination: (1) suspicious timing, ambiguous oral or written statements, and behavior toward or comments directed at other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination. *Sun*, 473 F.3d at 812; *Morgan*, 724 F.3d at 995–96; *Diaz*, 653 F.3d at 587.

Here, Dr. Hatcher's circumstantial evidence falls into the third category: evidence that she was qualified for the job in question but was passed over in favor of a man, and the University's reason is a pretext for discrimination. This same evidence also bears on her argument that her claim survives under the indirect method because, as previously explained, the remaining issues are limited to whether she was qualified for tenure, whether a similarly situated man was given preferential treatment, and whether the University's reason for denying tenure was pretext. *See Morgan*, 724 F.3d at 996; *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 973 n.2 (7th Cir. 2012). Therefore, the Court will discuss the circumstantial evidence with regard to both perspectives.

The Board contends that Dr. Hatcher was not qualified for tenure because the COLA committee, Dean Kempf-Leonard, and Provost Nicklow all independently reviewed Hatcher's dossier and determined that her research and record of publication were insufficient (Doc. 82, p. 15). The Court finds that Dr. Hatcher has put forth more

than enough evidence to establish that an issue of material fact remains as to whether she was qualified for tenure. For instance, Dr. Hatcher established that four of the six faculty members in her department voted in favor of her tenure and promotion; her department chair also recommended her for tenure and promotion; and five of the nine COLA committee members recommended her for tenure. There were eight letters from external reviewers (Doc. 86-6), which were described as "very positive of Dr. Hatcher's publication" and "not even just good, but very good" (Doc. 86-10, p. 13; Doc. 86-9, p. 7). Based on this evidence, a reasonable jury could undoubtedly conclude that she was sufficiently qualified for tenure to establish the second element of her prima facie case. *See Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93–94 (2d Cir. 1984) ("[W]e believe that a prima facie case that a member of a protected class is qualified for tenure is made out by a showing that some significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question.")).

The Board further contends that Dr. Hatcher was not similarly situated to Professors Bloom and Hildredth because they specialized in areas different than Hatcher, and the quality and quantity of their research was different than Hatcher's (Doc. 82, pp. 17–18). Again, the Court finds that Dr. Hatcher has put forth more than enough evidence to establish that an issue of material fact remains as to whether she was similarly situated to Bloom and Hildredth. In particular, all three were Assistant Professors in the Political Science Department, and they were all up for a promotion to Associate Professor with tenure at the same time. Tobin Grant—a professor in the

Political Science Department—wrote a letter to Provost Nicklow saying that Hatcher's dossier was "remarkably similar" to Hildreth's and Bloom's (Doc. 86-5). Scott McClurg—the former interim chair of the Political Science Department—testified that Hatcher's research quality was at least as good as Bloom and Hildreth's (Doc. 86-9, p. 6). Roger Clinton—chair of the Political Science Department—testified at his deposition that Hatcher, Bloom, and Hildreth were "equally qualified and deserving of promotion and tenure in [his] view and in the view of the senior faculty in the department." (Doc. 86-10, p. 10). Despite their similarities, Hatcher was denied tenure while Bloom and Hildredth were granted tenure. Based on this evidence, a reasonable jury could find that Hatcher was similarly situated to Bloom and Hildredth and that she was treated less favorably.

That brings the Court to the issue of pretext. The Board claims that it had a legitimate, non-discriminatory reason for denying Dr. Hatcher tenure: her record of research and publication was simply inadequate and did not meet the COLA's standards or the University's standards for promotion and tenure (Doc. 82). Therefore, the burden is on Dr. Hatcher to come forward with sufficient evidence to allow a reasonable factfinder to find that the University's proffered reason for its decision is pretextual. Pretext "is a deliberate falsehood," "a lie," "a phony reason for some action." *Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013); *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 666 (7th Cir. 2007). The question "is not whether the employer's stated reason was inaccurate or unfair . . . [because] [i]t is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee." *Collins*, 715 F.3d at 1000 (citing *Coleman v. Donahue,* 667 F.3d 835, 852 (7th Cir. 2012)).

Instead, the only question is whether the employer's proffered reason was pretextual, meaning that "it was lying in order to cover up the true reason: her [gender]." *Vanasco v. Nat'l-Louis Univ.*, 137 F.3d 962, 966 (7th Cir. 1998).

Based on Dr. Hatcher's written brief and her oral representations to the Court, the main thrust of her argument is that the policies and standards for determining whether to award tenure were applied differently to her than they were to Bloom and Hildredth, which is evidence that the University's proffered reason for denying her tenure is pretext for gender discrimination. For example, Dr. Hatcher points out that, in accordance with the Political Science Department's Operating Paper and the COLA's Operating Paper, the Dean and the Provost relied on the departmental faculty and the external reviewers' assessments of Bloom and Hildredth's scholarship, but rejected those same assessments when it came to her. Additionally, Dr. Hatcher claims that the Dean and the Provost ignored her positive external evaluations and instead highlighted selectively-chosen, negative sounding quips, but for Bloom and Hildredth, the Dean and the Provost never even mentioned genuinely negative content in their external evaluations. Dr. Hatcher also claims that the Dean and the Provost misrepresented facts in their letters denying her tenure. She further contends that the COLA Committee, the Dean, and the Provost failed to consider her subfield when evaluating the quality of the venues she published in, but they did so for Bloom and Hildredth. According to Dr. Hatcher, the only inference that a reasonable jury could draw is that the standards for tenure were applied differently to her because she is a woman.

In evaluating this argument, the Court will not delve into whether the

University's decision was incorrect (whether Dr. Hatcher was actually entitled to an award of tenure). "[A]rguing about the accuracy of the employer's assessment is a 'distraction' in the pretext context; the fact that a statement is inaccurate does not mean that it is a deliberate lie." *Collins*, 715 F.3d at 1000 (citation and internal quotation marks omitted). More importantly, in case after case, the Seventh Circuit has refused "'to review the merits of tenure decisions and other academic honors in the absence of clear discrimination. [They] have . . . recognized that scholars are in the best position to make the highly subjective judgments related with the review of scholarship and university service.'" *Adelman–Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007); *accord Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005); *Colburn v. Trustees of Indiana Univ.*, 973 F.2d 581, 589 (7th Cir. 1992).

The Court also will not engage in a comparative analysis of Dr. Hatcher's qualifications versus Bloom and Hildredth's. This line of analysis would be inappropriate in the circumstances of this case because there is no indication that Hatcher was competing for a single tenure slot against Bloom or Hildredth. Therefore, "the grant of tenure to [Bloom and Hildredth] was [not] necessarily a rejection of tenure for her." *Blasdel v. Nw. Univ.*, 687 F.3d 813, 823 (7th Cir. 2012). Furthermore, the evidence considered as a whole does not indicate that she was better qualified for tenure than Bloom or Hildredth. "[E]vidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Millbrook v. IBP, Inc.*, 280

F.3d 1169, 1180 (7th Cir. 2002) (citation and internal quotation marks omitted). *See also Blasdel*, 687 F.3d at 823–24; *Farrell*, 421 F.3d at 615. Dr. Hatcher offered evidence that her credentials were perhaps equal to Bloom and Hildredth's. However, no one, not even Dr. Hatcher, said that her qualifications were so superior to the credentials of Bloom and Hildredth that no reasonable person could have chosen them for tenure, but not her.

Instead, the Court will analyze whether there were irregularities in the evaluation of Dr. Hatcher's application for tenure and whether those irregularities cast doubt on the University's reason for denying tenure and give rise to an inference that gender animus motivated the decision. With respect to the first question, the Court easily concludes that the answer is "yes." The JRB determined that Provost Nicklow had violated the Departmental and COLA operating papers and University policies were violated, and the Chancellor agreed to some extent (*see* Docs. 82-19, 82-21). With respect to the second question, the Court just as easily concludes that the answer is "no." Dr. Hatcher testified at her deposition that, as far as she knew, Provost Nicklow genuinely believed that her record of research and publication was inadequate and did not meet the University's standards for promotion and tenure as stated in his March 1, 2012 letter (Doc. 82-1, pp. 14–15). She also testified that she did not believe that the COLA Committee's recommendation, Dean Kempf-Leonard's recommendation, or Provost Nicklow's decision were motivated by her gender (Doc. 82-1, pp. 7, 13, 15). Dr. Hatcher's admissions alone are fatal to her contention that the University's proffered reason for its decision was pretext for gender discrimination. Additionally, there is no evidence that the Dean or the Provost ever made any disparaging remarks about women, and three

other women within the COLA were promoted to Associate Professor with tenure the year that Hatcher was denied the same promotion (*see* Doc. 82-1, p. 9; Doc. 82-14). The Court is left with, at most, evidence that there were lapses and errors made in the evaluation of Dr. Hatcher's research that may have resulted in unfairness to her. *See Novak v. Bd. of Trustees of S. Ill. Univ.*, No. 14-2663, 2015 WL 525826, at *6, 8 (7th Cir. Feb. 10, 2015). Simply put, there is not even a scintilla of evidence from which the trier of fact could find that the University's proffered reason for denying tenure to Dr. Hatcher was deliberately false or motivated by the fact that she is a woman.

Regardless of whether Dr. Hatcher is litigating her case under the "direct" or an "indirect" method of proof, she has not created a triable issue of fact on the question whether she was denied tenure because of gender discrimination. Accordingly, the Board is entitled to summary judgment on Dr. Hatcher's claim of gender discrimination.

## CONCLUSION

Defendant Board of Trustees of Southern Illinois University's motion for summary judgment (Doc. 67) is **GRANTED.** Count One of the amended complaint is **DISMISSED with prejudice**. Because the other counts were previously dismissed, this action is **DISMISSED with prejudice** in its entirety. The Clerk of Court is directed to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED: February 18, 2015**

s/ Nancy J. Rosenstengel
**NANCY J. ROSENSTENGEL**
**United States District Judge**
