IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LAURA J. HATCHER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:13-CV-00407-NJR-SCW |
| | ) |
| BOARD OF TRUSTEES OF SOUTHERN ILLINOIS UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

A Motion for Summary Judgment (Doc. 132) filed by Defendant Board of Trustees of Southern Illinois University is pending before the Court. For the reasons set forth below, the Motion for Summary Judgment is denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Dr. Laura Hatcher was a non-tenured associate professor in the political science department at Southern Illinois University (the University) in 2012, when she was denied tenure and lost her teaching position. (Doc. 133, pp. 3-8). In the years leading up to her tenure review (specifically from July 2006 to September 2011), Dr. Hatcher's annual work evaluations were consistently positive. *Hatcher v. Board of Trustees of Southern Illinois Univ.*, 829 F.3d 531, 535 (7th Cir. 2016).

The tenure review process at the University is a multi-level, sequential process. The tenure candidate is first evaluated by the tenured faculty and chairperson of the respective department, followed by the College of Liberal Arts' Promotion and Tenure Committee, the Dean of the College of Liberal Arts, and then the Provost and Vice Chancellor of the University. *Id.* At each level, the previous recommendations are reviewed, and an

independent evaluation is conducted. Candidates are evaluated in three categories: scholarship, teaching, and service. (Doc. 82-4, pp. 2-3).

Dr. Hatcher's tenure review process began positively. First, the political science department voted 4-2 in favor of tenure and promotion, resulting in department chair Roger Clinton making a positive recommendation to the College of Liberal Arts. *Id.* The tenure committee for the College of Liberal Arts gave Dr. Hatcher a mixed recommendation that consisted of a 5-4 vote in favor of tenure but a 5-4 vote against promotion. (Doc. 82-11, p. 1). This recommendation was communicated to the dean of the College of Liberal Arts, Kimberly Kempf-Leonard. (Doc. 82-11, p. 1). Dean Kempf-Leonard both evaluated the committee's recommendation and conducted her own independent review. (Doc. 86-1). Dean Kempf-Leonard ultimately recommended Dr. Hatcher not receive tenure or promotion, and she conveyed this conclusion and her reasoning to Provost John Nicklow. (Doc. 86-1, p. 1). Provost Nicklow reviewed Dr. Hatcher's tenure dossier for himself and made a recommendation to Dr. Cheng against awarding Dr. Hatcher tenure or promotion. (Doc. 82-13, p. 1).

On April 12, 2012, after Dr. Hatcher received a letter from the Provost informing her of his recommendation against tenure and promotion, she filed a grievance with the University's Judicial Review Board (JRB). (Doc. 133, p. 6). On October 3, 2012, Dr. Hatcher also filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging the real reason the University denied her tenure and promotion was her gender. (Doc. 133, p. 6). Fifteen days later, the JRB issued its unanimous report concluding Provost Nicklow had violated the procedures outlined in the operating papers of the Political Science Department and the College of Liberal Arts, as well as the University's policies and

procedures. (Doc. 82-19, p. 10). In particular, the JRB found Provost Nicklow did not explain in detail how he reached his decision and why he reversed the Political Science Department's recommendation in favor of Dr. Hatcher. (Doc. 82-19, pp. 10-11). Based on its finding of "serious procedural errors," the JRB recommended overturning the negative decision of Provost Nicklow and promoting Dr. Hatcher to Associate Professor with tenure. (Doc. 82-19, p. 12).

Contrary to the JRB's report and recommendations, and approximately eight weeks after Dr. Hatcher filed her EEOC charge, Dr. Cheng recommended the board deny promotion and tenure to Dr. Hatcher. (Doc. 82-21, p. 1).

Dr. Hatcher filed this lawsuit against the Board on April 26, 2013, alleging gender discrimination in violation of Title VII of the Civil Rights Act, a retaliation claim based on the First Amendment, and two retaliation claims based on Title VII. (Doc. 2). This Court granted the Board's motions to dismiss on Dr. Hatcher's Title VII and First Amendment claims (Doc. 70), as well as the Board's motion for summary judgment on her gender discrimination claim (Doc. 95).

Dr. Hatcher appealed to the United States Court of Appeals for the Seventh Circuit. (Doc. 99). The Court of Appeals affirmed this Court's decision to dismiss Dr. Hatcher's gender discrimination claim, First Amendment retaliation claim, and one of her Title VII retaliation claims, *Hatcher*, 829 F.3d at 538-42, but reversed and remanded this Court's dismissal of Dr. Hatcher's claim alleging retaliation for filing of her EEOC charge. *Id*. The Court of Appeals reasoned that since filing an EEOC charge is a protected activity under Title VII and Dr. Hatcher indisputably suffered an adverse employment action, discovery on the issue of causation was appropriate. *Id.* at 538.

After the close of discovery, the Board filed the pending Motion for Summary Judgment. (Doc. 132). Dr. Hatcher filed a timely Response in Opposition (Doc. 135), and the Board filed a Reply (Doc. 136).

## ANALYSIS

Summary judgment is proper only where the moving party can demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). All facts and reasonable inferences must be construed in favor of the non-moving party. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (*citing Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 824 F.3d 645, 647-48 (7th Cir. 2016)). The Seventh Circuit has clearly stated motions for summary judgment in discrimination cases must be decided with particular care, given "they often turn on questions of credibility and intent." *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 893 (7th Cir. 1996). Thus, only where the evidence is merely colorable or not significantly probative is summary judgment proper. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The judge's role at summary judgment is not to weigh the evidence or assess the facts, but simply to determine whether there is a genuine issue for trial. *Id.* at 259. The question is can there be only one reasonable conclusion based on the evidence, or could reasonable minds differ? *Id.* at 250-511.

To state a claim for Title VII retaliation, a plaintiff must show she suffered an adverse employment action because of a statutorily protected activity. *Castro v. DeVry Univ. Inc.*, 786 F.3d 559, 564 (7th Cir. 2015). In short, the plaintiff must prove a causal link between the protected activity she engaged in and the adverse employment action. *Id.* The causal link

required in this context is but-for causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013); *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). The relevant question is whether "the record contains sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

When circumstantial evidence of a retaliatory motive is used to prove causation, the employer may show the employee would have suffered the adverse employment action even absent the protected activity.[1] *Lord*, 839 F.3d at 564. If the employer can make such a showing, then no but-for causation exists. *Id.* The employee can always attack the proffered justification as pretext, however, and if material issues of fact regarding pretext exist, summary judgment should be denied. *Id.*

Here, it is uncontested that filing a charge with the EEOC is a protected activity and that denial of tenure is an adverse employment action.[2] Thus, the only issue before the Court is whether there is sufficient evidence to present to a jury the question of whether the denial of Dr. Hatcher's tenure was in retaliation for her EEOC charge.

**I.** *Preliminary Matters*

Before addressing the substance of the parties' arguments, there are several preliminary matters that must be resolved. Specifically, the Board argues only the original denial of tenure is at issue here, and that Dr. Hatcher is judicially estopped from raising a

---

[1] As a point of clarification, the Court recognizes the Seventh Circuit in *Ortiz v. Werner* instructed district courts to stop applying different legal standards based on whether evidence of retaliation was "direct" or "indirect." 834 F.3d 760, 765 (7th Cir. 2016). The Seventh Circuit stated, however, that while the *McDonnell Douglas* burden-shifting framework is often referred to as an "indirect" means of proving discrimination, its holding in *Ortiz* was not intended to impact that test. *Id.* at 766. Thus, once a *prima facie* case is proven, it appears the burden shift described above remains the proper legal test.

[2] On appeal, the Seventh Circuit found Dr. Hatcher alleged a protected activity (filing a charge at the EEOC) and that she suffered an adverse employment action (denial of tenure). The Court is not sure these statements necessarily qualify as a legal finding. However, given the Seventh Circuit's statements and the fact that neither party briefed the issues, the Court considers those elements met.

claim regarding the denial of tenure that took place after the EEOC charge was filed. (Doc. 133, pp. 11-13). The Board also argues the University should be given "substantial deference" on all issues relating to tenure decisions, including this Title VII retaliation claim. (Doc. 133, p. 9).

**Judicial Estoppel**

The Board argues the adverse employment action taken against Dr. Hatcher (denial of tenure) occurred before her protected Title VII activity (the filing of an EEOC charge) and therefore the latter cannot possibly be the cause of former. (Doc. 133, pp. 11-12). The problem with this argument is that the record shows there were two separate denials of tenure. The first denial, on April 12, 2012, resulted in Hatcher filing a grievance with the JRB. (Doc. 133, p. 6). After filing her grievance, but before the JRB hearing or decision, Dr. Hatcher filed a claim with the EEOC. (Doc. 133, p. 6). The JRB subsequently found significant procedural errors in the tenure process and recommended Dr. Hatcher receive both a promotion and tenure. (Doc. 82-19, p. 12). Dr. Cheng overrode the JRB's findings and recommended denial of tenure again, *after* both the JRB grievance hearing process and the filing of the EEOC charge. (82-21, p. 1). Thus, contrary to the Board's claims, the facts indicate that the protected activity took place before Dr. Cheng's final denial of tenure.

Nonetheless, the Board urges this Court to find the only tenure decision at issue is the one that occurred before Dr. Hatcher filed her EEOC charge. (Doc. 133, pp. 11-12). On appeal, however, the Seventh Circuit rejected this same argument. *Hatcher v. Board of Trustees of Southern Illinois Univ.*, 829 F.3d 531, 537-38 (7th Cir. 2016). Rather, the Seventh Circuit found Dr. Hatcher had stated a plausible claim for retaliation based on the "fact that the Chancellor declined to act on the JRB's recommendation." *Id.* at 538. Thus, it is clear the

Seventh Circuit determined the relevant denial of tenure at issue was the decision by Dr. Cheng that took place after the EEOC charge was filed and the JRB recommendation was forwarded.

The Board advances a variation of this same argument under the theory of judicial estoppel. Judicial estoppel prevents a party from taking a position in one proceeding and then assuming a contrary position in a later proceeding. *New Hampshire v. Maine,* 532 U.S. 742, 742-43 (2001). In order for judicial estoppel to apply, however, the Court looks to whether the party's position is clearly inconsistent with an earlier position, whether a court has been persuaded to accept the party's earlier position, and whether the inconsistent position would provide the party with an unfair advantage. *Id.* at 743.

The Board argues that since Dr. Hatcher's complaint to the JRB stated she was denied tenure in March 2012, she is judicially estopped from claiming she was denied tenure later, in November 2012, after her EEOC charge was filed. (Doc. 133, pp. 11-13). As discussed above, this case involves more than one denial of tenure. It is not inconsistent for a plaintiff who is denied tenure on two different dates to make two separate and unrelated claims.

Further, it is unclear from the Board's argument how a court or administrative body has accepted Hatcher's alleged earlier position. While the JRB agreed with Dr. Hatcher that she should be given tenure, that finding was overruled by Dr. Cheng and cannot be considered the basis for an administrative or judicial decision. The EEOC charge filed by Dr. Hatcher merely resulted in her receiving a "notice-of-right-to-sue" letter. Such letters are issued by the EEOC only when it is *unable* to determine whether the law has been violated. UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *What You Can Expect After You File a Charge,* https://www.eeoc.gov/employees/process.com (last visited October 27,

2017) (emphasis added). Thus, the EEOC decision to provide Dr. Hatcher with a right-to-sue letter cannot be considered a legal determination. Further, the Seventh Circuit specifically focused on Dr. Hatcher's claim regarding the second denial of tenure, not even making a reference to the first claim. *Hatcher,* 829 F.3d at 536-38. As a result, nothing in that decision could form the basis for judicial estoppel.

Finally, the Board does not argue, and the Court fails to see, how Dr. Hatcher's claims regarding the denial of tenure could provide her with an unfair advantage. As the Board admits, discovery for this claim took place after the Seventh Circuit decision, and therefore the Board had fair warning and an opportunity to defend against this claim. Thus, the Court finds the tenure decision at issue in Dr. Hatcher's retaliation claim is the one made by Dr. Cheng after Dr. Hatcher filed her EEOC charge.

## Institutional Deference

The Board argues this Court should consider Hatcher's retaliation claim to be "fundamentally an attack on the academic decisions of academic decision-makers." (Doc. 133, p. 8). As such, the Board argues the University is entitled to substantial deference. (Doc. 133, p. 9). The Board is correct that courts generally give deference to academic institutions to set the standards for tenure and other decisions about who is entitled to teach. *Adelman-Reyes v. St. Xavier Univ.,* 500 F.3d 662, 667 (7th Cir. 2007). In *University of Pennsylvania v. EEOC,* however, the Supreme Court carved out an exception to this general rule in cases involving discrimination. 493 U.S. 182, 199 (1990) (finding the university was not prevented from using any criteria it wished in selecting teachers—except those proscribed under Title VII). The Seventh Circuit noted that to give deference in such cases would, "in essence, make academic institutions immune from the antidiscrimination

statutes." *Novak v. Bd. of Trustees of S. Illinois Univ.*, 777 F.3d 966, 975-76 (7th Cir. 2015).

Here, the Board appears to be asking the Court to give deference to Dr. Cheng's specific decision, not necessarily the tenure process itself. The Court notes the process for deciding tenure in Dr. Hatcher's case produced a substantially less than unanimous decision. The Board admits the tenured faculty in the Political Science Department split their vote, with two-thirds of the faculty members in favor of Dr. Hatcher receiving tenure and a promotion. (Doc. 133, p. 4). Then Dr. Hatcher's dossier was reviewed by nine tenured faculty members from the College of Liberal Arts committee, who also split their votes.[3] Subsequently, both Dean Kempf-Leonard and Provost Nicklow conducted their own reviews and made recommendations against both tenure and promotion, which Dr. Cheng forwarded to the Board. (Doc. 133, p. 5). After Dr. Hatcher filed a grievance, however, the tenured faculty members of the JRB recommended she receive both tenure and a promotion. (Doc. 133, p. 7). Per the collective bargaining agreement, the JRB findings replaced the recommendations against promotion and tenure made by the Dean and Provost. (Doc. 133-6 § 13.01(j)).

Thus, the only decision the Board is asking this Court to give deference to is the one made by Chancellor Cheng, who is the party accused of retaliation. Clearly, giving substantial deference to Dr. Cheng's decision would, in effect, insulate both her and the University from the antidiscrimination statues of the United States, as prohibited by the Seventh Circuit in *Novak v. Board of Trustees*. Thus, the Court finds the Board is entitled to no particular deference in this case.

---

[3] Somewhat confusingly, a majority of the members of the committee voted for tenure, but a minority voted for a promotion. (Doc. 133, p. 4).

## II. *But-For Causation*

In order to be successful in a Title VII retaliation claim, a plaintiff must establish the protected activity was the "but-for" cause of the employer's adverse employment action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2523-24 (2013). Direct evidence of retaliation is rare, as it generally involves an admission of retaliatory intent. *Armhein v. Health Care Servs. Corp.*, 546 F.3d 854, 858 (7th Cir. 2008). Thus, a plaintiff can prove retaliatory intent through circumstantial evidence which allows the trier of fact to infer intentional discrimination by the decision maker. *Id.*

Here, Dr. Hatcher argues that but-for Dr. Cheng's rejection of the JRB recommendation, she would have received tenure and a promotion. (Doc. 135, p. 10). Under the collective bargaining agreement in place at the time, Dr. Cheng was required to treat the JRB decision in the same manner as she would a decision by the Provost. (Doc. 133-6 § 13.01(j)). The Provost testified during deposition that Dr. Cheng never overturned his recommendations regarding promotion or tenure. (Doc. 135-2, 11:3-6, 13:23-14-2). The original denial of Dr. Hatcher's tenure is consistent with this pattern. The manner in which Dr. Cheng treated the second denial of tenure, however, is not. Unlike her prior practice with regard to the Provost's recommendations, Dr. Cheng overrode the recommendation she received from the JRB.[4] While it is possible that Dr. Cheng changed her practice for non-discriminatory reasons, a reasonable jury could conclude that such a change, coming just eight weeks after Dr. Hatcher filed her EEOC charge, was in response to that protected

---

[4] The Court recognizes the Chancellor was authorized to make such a change. Section 13.01(j) of the collective bargaining agreement states the Chancellor "shall make a decision on a tenure grievance case that is heard by the JRB…" The language of this section indicates that the Chancellor is entitled to make her own independent decision. Nothing in this language suggests the Chancellor is required to rubber stamp the JRB's decision. That fact, however, is not dispositive. It is not her authority to make the change that is at issue here, notwithstanding any claims to the contrary by Dr. Hatcher, but rather her motivation. If Dr. Cheng was motivated to make the change in retaliation for the EEOC charge filed by Dr. Hatcher, she will not be insulated from a discrimination charge simply because she has the authority to make such a change.

activity.

The Board further argues that causation is not proven because Dr. Hatcher has produced no evidence Dr. Cheng was aware of the EEOC charge. (Doc. 133, p. 15).[5] In support of their position, the Board points to Dr. Cheng's testimony during deposition that she had no recollection of when she found out about the EEOC charge. (Doc. 133, p. 15). This statement, however, must be considered against other evidence from which a reasonable jury could infer Dr. Cheng was in fact aware of the charge.

To begin with, Dr. Cheng testified that when the EEOC sent charges to the University, they would go to either the legal department or the affirmative action officer. (Doc. 135-3, 9:17-10:2). Provost Nicklow was made aware of the EEOC charge by University counsel Deborah Nelson during the JRB hearing. (Doc. 135-2, 17:12-18:10). Dr. Cheng admitted she would have discussed the JRB report regarding the denial of tenure with Deborah Nelson. (Doc. 135-3, 14:18-15:2). Thus, Chancellor Cheng was in direct contact with the very same person from the legal department who informed Provost Nicklow of the EEOC charge. The Court finds it unlikely, and a jury could certainly find it incredible, that Ms. Nelson would have failed to mention the EEOC charge to Dr. Cheng when they were discussing the very same denial of tenure that resulted in the JRB recommendation.

Dr. Cheng also testified the affirmative action officer would generally make her aware of any EEOC charges during a monthly meeting. (Doc. 135-3, 17:7-23). Dr. Hatcher filed her EEOC charge during early October (October 3, 2012) and Chancellor Cheng issued her final decision towards the end of November (November 27, 2012), meaning that almost

---

[5] The Board also argues that substantial evidence unrelated to the EEOC charges existed to support the denial of Dr. Hatcher's tenure. (Doc. 133, pp. 13-15). As this is effectively an argument that Dr. Cheng has a non-discriminatory basis for her decision, the Court finds it more relevant to the question of pretext, and will address the argument in that section.

two months passed between the two events. That amount of time allows for a reasonable inference that Chancellor Cheng would have been made aware of the EEOC charge at the monthly meeting, had the charge gone to the affirmative action officer. Thus, a reasonable jury could infer that Dr. Cheng's claim that she was not aware of the EEOC charges was incredible.

The Board also argues the timing of the decision is insufficient to prove the causation prong. (Doc. 133, p. 14). The Court notes temporal proximity alone is usually insufficient to create a genuine issue of material fact for trial. *Armhein v. Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008). Such timing may be sufficient, however, "[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct." *Lord*, 839 F.3d at 564 (citing *Culver v. Gorman & Co*, 416 F.3d 540, 546 (7th Cir. 2005), and *Lalvani v. Cook Cty.*, 269 F.3d 785, 790 (7th Cir. 2001).

Here, Dr. Hatcher does not appear to be relying solely on the timing between the filing of the EEOC charge and Dr. Cheng's denial of tenure. Rather, as discussed above, she argues Dr. Cheng's decision to make a recommendation different from the JRB was inconsistent with her prior behavior of simply forwarding recommendations regarding tenure to the Board. Further, Dr. Hatcher argues that sufficient evidence exists upon which a reasonable jury could find Dr. Cheng was aware of the EEOC charge prior to making her decision. These facts, combined with the timing of Dr. Cheng's decision, are sufficient to create a material issue of fact as to causation.

The Board disagrees, arguing that because the EEOC charge was filed close in time to the JRB's decision, and the Chancellor was required to respond to the JRB decision, the

timing cannot prove causation. (Doc. 133, p. 14). While this is a possible explanation for the close proximity in time, it is simply that—an explanation. It does not make the timing of the decision irrelevant in either the causation or pretext analysis.

Thus, there appear to be material issues of fact regarding the timing and the meaning of Dr. Cheng's decision not to follow the JRB recommendation. As stated above, it is not the Court's role to determine the truth of the facts, merely whether an issue should go to the jury. Since a reasonable jury could determine the timing combined with Dr. Cheng's reversal of the JRB decision creates an inference she was acting in response to the EEOC charge, summary judgment is inappropriate.

### III. *Pretext*

Once a *prima facie* case is established, the burden shifts to the employer to produce a non-discriminatory reason for its actions. *Nichols v. Southern Illinois Univ.—Edwardsville,* 510 F.3d 772, 784-85 (7th Cir. 2007). Here, the Board has proffered a legitimate non-discriminatory reason—that Dr. Hatcher's research and publications were insufficient to merit the privilege of tenure. (Doc. 133, p. 17). If an employer produces a non-discriminatory reason, the burden shifts back to the employee to demonstrate the proffered reason is a pretext for discrimination. *Id.* at 785. Pretext "involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'" *Argyropoulos v. City of Alton,* 539 F.3d 724, 736 (7th Cir. 2008) (quoting *Sublett v. John Wiley & Sons, Inc.,* 436 F.3d 731, 737 (7th Cir. 2006)). An employer's reasons can be "foolish or trivial or even baseless," but as long as they are honestly believed they do not qualify as pretext. *Culver,* 416 F.3d at 547 (quoting *Hartley v. Wis. Bell, Inc.,* 124

F.3d 887, 890 (7th Cir. 1997).[6]

A plaintiff can demonstrate the employer's explanations are pretext by showing "a discriminatory reason more likely motivated" the employer's actions, or that the employer's explanations are "unworthy of credence." *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009). The bottom line is that summary judgment is improper when the sincerity of an employer's reason for taking an adverse employment action is called into doubt. *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 395 (7th Cir. 1998).

Dr. Hatcher argues several bases exist upon which a factfinder could infer Dr. Cheng's explanation for failing to follow the JRB's recommendation was insincere. As discussed above, Dr. Cheng claimed not to remember when she became aware of Dr. Hatcher's EEOC complaint. (Doc. 133, p. 15). Perhaps Dr. Cheng truly does not remember. But a jury could reasonably infer Chancellor Cheng did know about the EEOC charge and that her claims to the contrary are insincere and intended to mask the role the EEOC charge played in her denial of tenure.

If a decision is reached in an "unusual way," that can be evidence of pretext. *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010)). While the collective bargaining agreement may not have required Dr. Cheng to forward the JRB recommendation unchanged, the fact that she made a contrary recommendation was certainly an inconsistent action on her part.[7] As a result, a jury could find Dr. Cheng's behavior regarding the JRB

---

[6] The Board alleges the Seventh Circuit determined no pretext existed in this case and that finding should be considered the "law of the case." (Doc. 133, p. 17). This argument is specious as best. The part of the Seventh Circuit decision cited by the Board for this argument addresses Dr. Hatcher's Title VII discrimination claim, not her retaliation claim. *Hatcher*, 829 F.3d at 542. Further, such a finding is clearly inconsistent with the appellate court's remand of the retaliation claim for further proceedings.

[7] The Board argues that because Dr. Hatcher cannot produce any evidence that Dr. Cheng previously accepted a JRB recommendation to award tenure for a procedural flaw, there is no evidence she acted inconsistently in this case. (Doc. 133, p. 15). The Court finds the Board's attempt to frame the comparison so narrowly unpersuasive. No evidence is before the court that such a situation ever occurred before, or during, Dr. Cheng's time as

recommendation was unusual enough to lead to an inference of pretext. Further, the Grievance Procedure at the University requires the Chancellor to recuse herself from participating in the "decision of any grievance" involving promotion and tenure cases where she had prior consultation with the Provost over the substance or disposition of the case. (Doc. 135-1 p. 6 ¶ 16). Chancellor Cheng admitted in deposition that she and Provost Nicklow discussed his original recommendation against Dr. Hatcher's promotion and tenure. (Doc. 135, 25:13-26:9). Thus, it appears Dr. Cheng failed to follow the University's grievance procedure as it relates to recusal. While not dispositive, failure to follow internal employment procedures can constitute evidence of pretext. *Jajeh v. Cty. of Cook*, 678 F.3d 560, 572 (7th Cir. 2012) (*quoting Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005).

Given the timing between the EEOC charge and tenure decision, the evidence of inconsistency in Dr. Cheng's approach to recommendations on tenure, and the alleged violation of University policy, the Court finds material issues of fact exist on the issue of pretext. Thus, whether Dr. Cheng's decision was motivated by the EEOC complaint or other non-discriminatory reasons is best left to the sound discretion of a jury.

---

Chancellor. Thus, the Board is asking the Court to find that since no comparison is possible, there can be no inconsistency. Such an approach creates a slippery slope, because a defendant can always narrow the comparison to such specific facts that no comparable case can be found. The Court believes the better analysis is to determine how Dr. Cheng's actions in this tenure decision compare to her actions in prior tenure decisions.

## CONCLUSION

Because material issues of fact remain for a jury to determine, the Court **DENIES** Defendant Southern Illinois University's Motion for Summary Judgment (Doc. 132). A final pretrial conference and jury trial will be set by separate Order.

**IT IS SO ORDERED.**

DATED:   October 30, 2017

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**